UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JOSE M. LUGO-GONZALEZ,           )
                                 )
            Plaintiff            )
                                 )
      v.                         )  CAUSE NO: 2:09-cv-338
                                 )
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,              )
                                 )
            Defendant            )


## OPINION AND ORDER

This matter is before the court on the Petition for Judicial
Review of the Decision of the Commissioner of Social Security
filed by the plaintiff, Jose M. Lugo-Gonzalez, on February 19,
2010.  For the reasons set forth below, the decision of the
Commissioner is AFFIRMED IN PART and REVERSED AND REMANDED IN
PART.

## Background

The plaintiff, Jose M. Lugo-Gonzalez, applied for Supplemen-
tal Security Income (SSI) on December 1, 2005, alleging a dis-
ability onset date of March 15, 2005.  (Tr. 24, 102, 269)  His
claim initially was denied on February 7, 2006, and again denied
upon reconsideration on June 7, 2006.  (Tr. 24, 34-35)  Lugo-
Gonzalez requested a hearing before an Administrative Law Judge
("ALJ") on July 12, 2006.  (Tr. 24, 89)  Video teleconference
hearings were held before ALJ Shirley Moscow Michaelson on April

19, 2007, and May 13, 2008. (Tr. 267-353)  At the April 2007
hearing, medical expert Dr. Ashok Jilhewar, M.D. and vocational
expert Lee Knutson testified.  (Tr. 297-303)  Plaintiff testified
through a Spanish interpreter, Jorge Carbajosa.  (Tr. 270)  At
the May 2008 hearing, medical expert Dr. Larry Kravitz, Ph.D. and
vocational expert Edward Pagella testified.  (Tr. 336-342, 345-
349)  Plaintiff again testified through a Spanish interpreter,
Carina Julian.  (Tr. 310-11)

On October 14, 2008, the ALJ issued her decision denying
benefits.  (Tr. 24-33)  The ALJ found that Lugo-Gonzalez was not
under a disability as defined in the Social Security Act from
March 15, 2005, through October 14, 2008.  (Tr. 32-33)  Lugo-
Gonzalez requested a review of the decision on October 28, 2008.
(Tr. 12-17)  The Appeals Council denied the request on August 12,
2009.  (Tr. 3-5)  Lugo-Gonzalez filed his Complaint in this court
on October 14, 2009.

Lugo-Gonzalez was born on October 23, 1965, making him 42
years old on the date of the ALJ's decision.  (Tr. 102, 107)  He
is unable to communicate in English.  (Tr. 30, 39, 301, 348)  He
is 5' 7" in height and weighs approximately 267 pounds.  (Tr.
111, 192)  He completed high school in Puerto Rico and worked
there as a security guard and gas station cashier.  (Tr. 107,
110, 266)  He emigrated to New York in the 1990s and then moved

to Indiana to look for work.  (Tr. 107)  He has not worked since 1982 when he was employed as a security guard in Puerto Rico. (Tr. 266)  He has not lived outside the United States since April 1, 1997.  (Tr. 102)  At the time of the hearings he lived alone in Section 8 housing in East Chicago, Indiana and received food stamps. (Tr. 103, 107)

Lugo-Gonzalez was diagnosed with obesity, hypertension, hyperlipidemia, diabetes, diabetic retinopathy, osteoarthritis, lumbar radiculopathy, spinal stenosis, tendinitis of the right knee, lumbar segmented dysfunction, sacrum ilium segmented dysfunction, back pain with a history of lumbar disc herniation, and major depressive disorder severe, recurrent. (Tr. 112, 134, 139, 163, 164, 179, 193, 197, 198, 201, 203, 207, 218, 237)  He had arthroscopic surgery on his left knee before he left Puerto Rico in 1995.  (Tr. 111, 194, 199, 214)  In May 2001, Lawrence DiRisio, a physician's assistant in Rochester, NY, evaluated Lugo-Gonzalez for lower back pain and left knee pain.  (Tr. 217-18)  His x-rays from September 1999 revealed some mild osteo-phytic formation but no other obvious bone abnormality.  (Tr. 217)  His MRI report from October 2000 indicated a L4-5 posterior and right paracentral disc herniation impinging the right L5 nerve root.  (Tr. 218)  Lugo-Gonzalez was prescribed TENS patches, referred to physical therapy for his knee, and given a

home exercise program. (Tr. 218) DiRisio explained to Lugo-Gonzalez that his obesity was contributing to his back and knee problems and that it was important for him to lose weight. (Tr. 218) Dr. Peter Capicotto agreed with DiRisio's evaluation. (Tr. 218)

On June 11, 2003, Lugo-Gonzalez saw Dr. Capicotto again for low back pain radiating through his right leg. (Tr. 211) A June 17, 2003 MRI showed moderate degeneration of the L4-5 disc and mild degeneration of the L1-2 and T11-12 discs. (Tr. 212) There was a right posterolateral disc herniation at the L4-5 disc with displacement of the right L5 root. (Tr. 212) The disc levels were otherwise unremarkable except from mild bilateral facet arthropathy at the L5-S1 and at L3-4. (Tr. 212) Dr. Capicotto recommended Lugo-Gonzalez for a conservative program which included epidural injections. (Tr. 210) On June 25, 2003, Dr. Capicotto noted Lugo-Gonzalez was totally disabled due to his pain. (Tr. 210)

In October 2003, Lugo-Gonzalez began receiving heat and EMS treatment from Dr. Robert Martin, a chiropractor. (Tr. 204) Dr. Martin treated him several times per year through 2005, and again in June 2007. (Tr. 204)

In July 2004, MRIs of Lugo-Gonzalez's lumbar spine ordered by Dr. Arvind Kakodkar showed mild posterior disc herniation at

the L5-S1, a large posterior disc herniation at the L4-L5, marked degree of spinal stenosis at L4-L5 disc level, mild spinal stenosis at L3-L4 and L5-S1 levels, mild universal herniation of L1-L2, and T11-T12 intervertebral discs. (Tr. 163-64) A July 2004 x-ray, also ordered by Dr. Kakodkar, showed degenerative spurring of L1-L2 and L4-L5 with narrowing of disc space between them. (Tr. 165)

Dr. Ramon Llobet wrote a letter dated June 1, 2005, stating that Lugo-Gonzalez was his patient and had malignant hypertension, Diabetes Mellitus, obesity, and spinal stenosis. (Tr. 139) Dr. Llobet stated "because of these multiple medical problems, the patient is unable to engage in any profitable type of activity." (Tr. 139)

On November 16, 2005, Lugo-Gonzalez sought treatment from psychiatrist, Dr. Graciela E. Hernandez. (Tr. 220) He said he felt depressed and anxious, had crying spells, had financial problems, could not sleep, and became irritable. (Tr. 220) Dr. Hernandez determined Lugo-Gonzalez's affect was depressed and anxious, but she noted that he was spontaneous, coherent, relevant, not overly psychotic, and in touch with reality. (Tr. 220) She diagnosed him with Major Depressive Disorder, recurrent and severe, and prescribed Lexapro and Buspar. (Tr. 220) Lugo-Gonzalez began therapy sessions with Dr. Hernandez. (Tr. 221) He

saw her approximately twice a month through April 2008. (Tr. 221-237) Dr. Hernandez took Lugo-Gonzalez off the Buspar and kept him on the Lexapro through September 2007, until she changed his medication to Cymbalta in April 2008. (Tr. 220-237) On April 11, 2006, Dr. Hernandez determined Lugo-Gonzalez's affect was mildly depressed and assigned him a GAF[1] of 40. (Tr. 223) During the course of his treatment, Dr. Hernandez assigned Lugo-Gonzalez GAF scores between 40-45[2]. (Tr. 223-237)

On March 9, 2006 Dr. Llobet evaluated Lugo-Gonzalez for "White Coat Syndrome", a phenomenon in which the patient has an elevated blood pressure in a clinical setting, with a 24-hour blood pressure test. (Tr. 142-151, 181-190) The blood pressure test was consistent with severe hypertension. (Tr. 140, 179)

On May 5, 2006, Lugo-Gonzalez underwent a myocardial profusion scan and a cardiac stress test because he was experiencing chest pain for a month. (Tr. 177) The findings included post stress, thinning and mild to moderate decreased perfusion in the

---

[1] The GAF scale measures a "clinician's judgement [sic] of the individual's overall level of functioning." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM IV-TR) 34 (4th ed. 2000). The procedures called for in that DSM-IV-TR require a mental health professional to assess a person's current legal of symptom severity and current level of functioning and adopt the lower of the two scores as the final score. DSM-IV-TR at 32-33. A GAF score of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work, family relations, judgment, thinking, or mood. DSM-IV-TR at 34.

[2] A GAF score of 41-50 indicates serious symptoms or any serious impairment in social or occupational functioning. See DSM-IV-TR at 34.

inferior wall, and an ejection fraction of 67%. (Tr. 177) He achieved 73% of the target heart rate during the stress test, a multistage treadmill exercise. (Tr. 177)

March 5, 2007, Lugo-Gonzalez was examined by Dr. Joseph Spott, D.O., for low back pain. (Tr. 199) Dr. Spott found that Lugo-Gonzalez's left and right lower extremities were normal, he had no instability with examination of the shoulder bilateral, elbow bilateral, wrist bilateral, hip bilateral, knee bilateral, and ankle bilateral. (Tr. 200-01) He was able to walk on heels and toes with no difficulty, he had a normal bilateral straight-leg raising test, his flip sign was normal bilateral, pelvic rock test was normal bilateral, Patrick test was normal bilateral, and his Cervical, Thoracic, and Lumbar vertebrae demonstrated no evidence of subluxation, dislocation, or laxity. (Tr. 201) He had a normal range of motion exam with no pain or crepitus noted. (Tr. 201) His thoracic range of motion was within normal limits, and his lumbar range of motion was normal, with full flexion/extension and side bending. (Tr. 201) Dr. Spott believed that Lugo-Gonzalez had mechanical low back pain and right knee pain and recommended physical therapy three times a week for four weeks and pain management medication. (Tr. 201) Lugo-Gonzalez refused surgery and injections. (Tr. 201) Dr. Spott ordered x-rays in March 2007 that showed mild to moderate arthritic changes

of the lower thoracic, upper and lower lumbar region, narrowing of intervertebral disc spaces of lower thoracic and upper lumbar spine, and narrowing of L4-L5 disk space. (Tr. 197) Right knee X-rays showed mild arthritic changes of the knee joint. (Tr. 198)

On March 19, 2007, Dr. Tarek Shahbandar from the Pain Center, examined Lugo-Gonzalez for lower back pain which he described as a tightening pain with numbness and tingling. (Tr. 194-196) The examination of the lumbar spine revealed negative straight leg raising, but produced left knee pain. (Tr. 195) Bilateral hip flexion, knee flexion, knee extension, ankle dorsiflexion, and plantar flexion were 5/5 bilaterally. (Tr. 195) Dr. Shahbandar's impression was that Lugo-Gonzalez had a large disc herniation at L5-S1 and L4-L5 encroaching on the foramen. (Tr. 195) Dr. Shahbandar prescribed Tramadol and Medrol Dosepak and scheduled a one month follow-up. (Tr. 195-96) Lugo-Gonzalez declined any type of procedure. (Tr. 195)

On March 27, 2007, Dr. Kakodkar filled out a medical source statement of physical ability to do work-related activities form. (Tr. 167-70) Dr. Kakodkar indicated that Lugo-Gonzalez's lifting and carrying abilities were affected by his impairment but his specific limitation would need to be determined by an orthopedic surgeon. (Tr. 167) Also, Dr. Kakodkar indicated that Lugo-

Gonzalez's ability to stand and/or walk was not affected by the impairment. (Tr. 167) Dr. Kakodkar did not indicate whether sitting was affected by the impairment, but if it was affected, he concluded that specifics would need to be determined by an orthopedic surgeon. (Tr. 168) Pushing and pulling was affected by the impairment in the lower extremities. (Tr. 168) Dr. Kakodkar stated that Lugo-Gonzalez was physically affected by lumbosacral radiculopathy. (Tr. 168) He indicated that Lugo-Gonzalez occasionally could climb ramps, stairs, ladders, ropes, scaffold, balance, kneel, stoop, but that he never could crouch or crawl, and that he had unlimited reaching in all directions, handling, fingering, feeling, seeing, hearing, and speaking. (Tr. 169) Dr. Kakodkar indicated that Lugo-Gonzalez should not work near hazards. (Tr. 169)

On April 16, 2007, Lugo-Gonzalez saw Dr. Spott for his follow up where he complained of pain in his lower back, left knee, and arm. (Tr. 192) He experienced a decrease in pain from a ten to a nine on a one to ten pain scale. (Tr. 192, 194) Examination of his lumbar spine revealed that his bilateral hip flexion, knee flexion, knee extension, ankle dorsiflexion, and plantar flexion were 5/5. (Tr. 192) Dr. Spott found that Lugo-Gonzalez had lumbar disc bulging and lumbar radiculopathy. (Tr. 193) Lugo-Gonzalez again declined an epidural steroid injection,

and Dr. Spott had no other treatments to offer.  However, he prescribed a Lidoderm patch in addition to his other prescribed medications.  (Tr. 193)

Upon Lugo-Gonzalez's application for benefits, the administration had several physicians review and evaluate his condition. On January 16, 2006[3], Shashi Anand, Ph.D., performed a psychological evaluation on Lugo-Gonzalez at the request of the agency. (Tr. 107-109)  At the time of the evaluation, Lugo-Gonzalez was residing alone in Section 8 housing and receiving food stamps and Medicaid.  (Tr. 107)  He cooked and cleaned for himself on a daily basis. (Tr. 107) He told Dr. Anand that he smoked one pack of cigarettes in three days, drank occasionally, and smoked one marijuana blunt per week.  (Tr. 108)  Dr. Anand diagnosed Lugo-Gonzalez with a history of marijuana abuse, in remission, and a history of depression.  (Tr. 109)  He assigned Lugo-Gonzalez a GAF of 70.[4]  (Tr. 109)  Dr. Anand found Lugo-Gonzalez's memory for recent and remote events was intact, immediate recall and concentration was fair, and general information and conceptual thinking was intact.  (Tr. 109)

---

[3]The year on the report is 2005, however the fax records indicate that it was sent in January 2006.  (Tr. 107)

[4] A GAF score of 61 to 70 indicates some mild symptoms or some difficulty in functioning but generally functioning pretty well, has some meaningful interpersonal relationships.  DSM IV-TR at 34.

On January 30, 2006, Dr. William Shipley reviewed Dr. Anand's evaluation and found that Lugo-Gonzalez had no medically determinable impairment.  (Tr. 114-127)  Dr. Shipley noted that Dr. Anand did not give Lugo-Gonzalez an active diagnosis at his evaluation.  (Tr. 126)  On June 2, 2006, Fred Kladder, Ph.D., reviewed all the evidence in the file and affirmed Dr. Shipley's assessment that Lugo-Gonzalez was not disabled.  (Tr. 34, 161)

On January 25, 2006, Dr. Adela Perez performed a physical examination of Lugo-Gonzalez at the agency's request.  (Tr. 110-112)  Dr. Perez determined that Lugo-Gonzalez was morbidly obese with hypertension that was not well controlled with medication, had diabetes mellitus, hyperlipidemia, major depression, diabetic retinopathy, osteoarthritis, back pain with a history of lumbar disc herniation with radiculopathy to the right leg, and chronic tendinitis of his right knee.  (Tr. 112)  Dr. Perez thought that Lugo-Gonzalez's main problem was his major depression, which he was being treated for by a psychiatrist at the time.  (Tr. 112)  Dr. Perez also stated that although Lugo-Gonzalez had a lot of aches and pains, they seemed to be well-controlled with medications.  (Tr. 112)  On February 2, 2006, Dr. F. Montoya reviewed Dr. Perez's diagnosis and determined that Lugo-Gonzalez was not

disabled.[5]  (Tr. 35)  Dr. M. Ruiz affirmed Dr. Montoya's assess-
ment.  (Tr. 162)

At the April 19, 2007 video conference hearing before ALJ
Moscow-Michaelson, Lugo-Gonzalez testified through an interpreter
that he walked 20 to 25 minutes to the hospital and that he also
walked to the supermarket.  (Tr. 294)  He went shopping with a
neighbor about three times a month when he received his food
stamps or when he needed something. (Tr. 295)  He used a hand
carriage to carry the groceries home and he could lift a gallon
of milk.  (Tr. 295)  Lugo-Gonzalez stated he was able to drive
but walked to the grocery store so he could exercise.  (Tr. 295)
He testified that he could lift about 50, 60, or 100 pounds
depending on how he grabbed the object.  (Tr. 295)

Lugo-Gonzalez stated that he would like to get a job so he
could take care of his children but that he could not get a job,
for example, as a security guard at a parking lot, because he
felt useless with all the pain.  (Tr. 296)  He could stand
comfortably for 20 to 25 minutes and then had to sit for ten to
15 minutes.  (Tr. 291)  He could sit for 30 minutes.  (Tr. 292)
Lugo-Gonzalez rated his current knee and back pain during the
trial as a nine on a scale of one to ten with "ten being so bad
[he] would be in the emergency room."  (Tr. 292)  He took Trama-

_____

[5] The record does not contain Dr. Montoya's assessment.

dol, a pain medication, on the day of the trial, which he took three times a day. However, he said that it did not help with the pain. (Tr. 293) He also wore his pain patch at night to help him sleep. (Tr. 293)

Lugo-Gonzalez received physical therapy from Dr. Spott, and he felt a little relief from the pain. (Tr. 294) When he finished physical therapy, Dr. Spott gave him exercises to do at home, which included walking. (Tr. 294) Lugo-Gonzalez testified that Dr. Spott and one of his chiropractors told him he had six herniated discs. (Tr. 277, 287) The ALJ examined the x-rays from 2004 and found four herniated discs, two as mild herniation. (Tr. 289) However, more recent records and x-rays were unavailable, and the ALJ asked to have those records for the next hearing. (Tr. 290)

Lugo-Gonzalez said the last time he went to the pain clinic was a few days prior to the hearing and that Dr. Shahbandar prescribed him Lidoderm patches. (Tr. 278-79) He previously received three injections "a long time ago." (Tr. 279)

Lugo-Gonzalez sought treatment for his pain from two chiropractors, Dr. Martin and then from Dr. Hoffers. (Tr. 279-80) At the time of trial, Dr. Hoffers had been treating Lugo-Gonzalez for about two years and saw him approximately twice a month. (Tr. 280) Lugo-Gonzalez showed the judge his TENS unit which he

used on his lower back and knee when he had a lot of pain,
approximately 30 minutes per week. (Tr. 281) Seeing the chiro-
practor and using the TENS unit helped a little with his pain.
(Tr. 282)

Dr. Ashok Jilhewar testified at the hearing as a medical
expert, and he assessed Lugo-Gonzalez's residual functional
capacity (RFC). He reviewed and summarized Dr. Perez's consulta-
tive examination report and testified that Lugo-Gonzalez had
morbid obesity with a BMI of 42, hypertension, and a tender left
knee. (Tr. 297-298) His gait was normal, his lumbar inflexion
was 50, there were no muscle spasms, and no motor weakness. (Tr.
298) Dr. Jilhewar opined that Lugo-Gonzalez could do light work
with occasional lifting, had the ability to stand up six hours in
an eight-hour workday, but needed to sit for five minutes at
half-hour intervals. (Tr. 298) He had no manipulative limita-
tions for his hands and no sitting limitations. (Tr. 298) He
did not have radiculopathy, positive straight-leg raising, or
atrophy. (Tr. 299) Dr. Jilhewar stated that Lugo-Gonzalez
occasionally could balance and climb stairs, frequently climb
ramps, but never climb ropes or scaffolds or work at unprotected
heights. (Tr. 299)

Vocational Expert Lee Knutson was last to testify at the
hearing. (Tr. 300) The ALJ posed a series of hypothetical

14

questions.  First, the ALJ asked if the need to sit for five
minutes of every hour eroded the occupational base at light work.
(Tr. 300)  Knutson testified that the need to sit would erode the
occupation base by 50 percent.  (Tr. 300)  He further stated that
the need to sit five minutes every hour caused the most signifi-
cant erosion of the occupational base because if he had to sit
longer than that, it would be considered sedentary.  (Tr. 300)
Before Knutson listed any jobs available, the ALJ modified the
hypothetical to included the ability to speak English.  (Tr. 301)
Knutson said that left light cleaning jobs (9,000 positions),
hand packer jobs (8,000 positions), production inspector, weigh-
er, and checker jobs (3,500 positions), and parking lot attendant
jobs (2,000 positions).  (Tr. 301-02)  He said the number of jobs
he listed was cut in half because of the need to sit, not the
inability to speak English.  (Tr. 301)  Next, the ALJ asked the
VE about the availability of jobs if Lugo-Gonzalez had to sit
more than five minutes at a time.  Knutson stated that would
leave sedentary type jobs.  (Tr. 302)  The ALJ asked Knutson to
consider sedentary jobs that accommodated a lack of English.
(Tr. 302)  Knutson identified the following jobs: bench assem-
blers (4,800 positions), packers and packagers (2,500  posi-
tions), and sedentary inspectors, weighers, and checkers (960
positions).  (Tr. 303)  Knutson reduced the positions available

by 30 percent because of the need to sit and stand at will. (Tr. 303) Knutson stated that his testimony was consistent with the Dictionary of Occupational Titles and that he derived the available job numbers by looking at the nine county Chicago Metropolitan Statistical area, using the most recent data and making adjustments based on the DOT for skill level and physical demand level. (Tr. 303)

ALJ Moscow Michaelson conducted a supplemental video conference hearing on May 13, 2008. (Tr. 308-353) Lugo-Gonzalez testified through an interpreter that he was standing during the hearing because he had pain in the middle of his back and was feeling tension and pressure. (Tr. 326) He rated the pain as a seven and a half or eight on a ten point scale with "ten being so severe [he would] be crying and calling for an ambulance." (Tr. 326) He said that when he experienced pain at this level he walked, sat, or lied down on the floor. (Tr. 326) Lugo-Gonzalez said that he could sit or stand for 20 to 25 minutes depending on the pain. (Tr. 326) At the time of this hearing, he was taking Naproxen for the pain. (Tr. 327)

The ALJ questioned Lugo-Gonzalez about his marijuana use. He testified that the last time he used marijuana was the week before the hearing when he smoked two small joints. (Tr. 331) He said he smoked marijuana two or three times a week, which he

got from his friends for free. (Tr. 332) His friends gave him marijuana because he lets them use his truck for moving or other tasks. (Tr. 332)

Lugo-Gonzalez did all of his own shopping, and if he needed help he asked a friend. (Tr. 334-35) He prepared all of his own meals and sometimes he ate with other people. (Tr. 335) He did his own laundry, took out his garbage and took care of all of his own personal needs. (Tr. 335) He exercised almost every day and liked to watch wrestling matches and read advertisements. (Tr. 335) He talked to his friends and sometimes walked two to three blocks with his friends. (Tr. 333) He also walked three blocks when he went to the grocery store. (Tr. 333) Lugo-Gonzalez said that when he went to the grocery store, he usually would buy a gallon of milk and other items at the same time. (Tr. 334) He stated that he could carry at least ten pounds and probably 20. (Tr. 334)

The side-effect of Lyrica made Lugo-Gonzalez gain weight and his heart medication, Altace, made him cough when he took it. (Tr. 343-44)

Dr. Larry Kravitz, a psychologist, testified as a medical expert with respect to Lugo-Gonzalez's mental impairments. (Tr. 328-331. 336-341) Dr. Kravitz reviewed Dr. Hernandez's treatment notes and summarized them at the hearing. (Tr. 330) Lugo-

Gonzalez saw Dr. Hernandez about once a month and was diagnosed with major depressive disorder, recurrent and severe. (Tr. 330) Dr. Hernandez assigned Lugo-Gonzalez GAF scores between 40 to 45, indicating serious symptoms, and noted that Lugo-Gonzalez's mental status generally had been intact. (Tr. 330) Dr. Hernandez repeatedly noted that Lugo-Gonzalez was less depressed. (Tr. 330) There was no mention of marijuana abuse in Dr. Hernandez's notes. (Tr. 331) Dr. Kravitz opined that Lugo-Gonzalez did not meet or equal any listed impairment. (Tr. 336) He said that Lugo-Gonzalez was diagnosed with major depressive disorder recurrent severe and marijuana abuse. (Tr. 337) The ALJ asked Dr. Kravitz to give the "B Criteria"[6] and rate those criteria. (Tr. 337) Dr. Kravitz gave Lugo-Gonzalez mild restrictions in activities of daily living, social functioning, and concentration, persistence, and pace, with no deteriorations. (Tr. 337) He found that Lugo-Gonzalez had a non-severe mental impairment. (Tr. 337) Dr. Kravitz explained that even though Lugo-Gonzalez was diagnosed with a severe major depressive disorder, the treatment notes mostly described the depression as mild when they commented on the severity. (Tr. 337) Dr. Kravitz noted that the

_____

[6]If the claimant has a medically determinable mental impairment, the function limitations it imposes on claimant activities, the "B criteria," must be determined. The B criteria functional areas are activities of daily living, social function, concentration, persistence or pace and episodes of decompensation. Craft v. Astrue, 539 F.3d 668, 674 (7th Cir. 2008).

GAF scores were inconsistent with Dr. Hernandez's treatment notes and he assumed that Dr. Hernandez factored in Lugo-Gonzalez's physical complaints into the GAF. (Tr. 337) Dr. Kravitz stated that he would not put Lugo-Gonzalez in a work environment with high levels of stress, unpredictable stressors, or strict production. (Tr. 338) For example, Lugo-Gonzalez should not be put in an environment where he had to deal with irate or difficult customers on a regular basis or in an environment where a supervisor said to double production for the next day or two. (Tr. 338) Further, he should not be put in an environment where the work responsibilities changed dramatically from day to day. (Tr. 338)

Vocational Expert Edward Pagella testified at the May 13, 2008 hearing. (Tr. 345-349) Pagella verified that if a person with limited English needed to sit five-minutes of every hour that it would erode 50 percent of the light occupational job base. Also, if that same person needed to sit a lot more than five minutes of every hour, it would be sedentary work. (Tr. 345) The ALJ proposed a hypothetical with the additional limitations that the person could not handle high production or a lot of frequent changes and could not have frequent contact with irate public. (Tr. 346) Pagella stated that the person could perform jobs including light cleaning, parking lot attendant,

hand packer, production visual inspection, checker, and weigher.
For sedentary jobs, Pagella identified bench assembler, packer or
packager, and weigher. (Tr. 346) He further testified that if
the person needed to sit and stand at will throughout the work-
day, it would be sedentary work, and he could perform a variety
of manufacturing occupations including hand packers, hand sort-
ers, and hand assemblers. (Tr. 347) These jobs allow the indi-
vidual to sit or stand at will throughout the course of the work-
day only requiring utilization of his upper extremity bilaterally
to keep up persistence and pace. (Tr. 348-49) Pagella stated
that the need to alternate sit/stand still would leave a signif-
icant number of sedentary jobs. (Tr. 347) Upon questioning by
Lugo-Gonzalez's attorney, Pagella testified that if the individ-
ual's production pace was off 15 to 20 percent, it would elimi-
nate those previously identified jobs that require a production
quota. (Tr. 349) Pagella also testified that the hypothetical
individual's inability to communicate in English would eliminate
any type of clerical or service occupation that Knutson identi-
fied in the manufacturing industry. (Tr. 348) Pagella stated
that his testimony was consistent with the DOT. (Tr. 349) His
assessment that the mentioned jobs would exist in significant
numbers was based on the United State Department of Labor, U.S.

Census Bureau of Statistics, and his professional experience. (Tr. 349)

In her decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled. (Tr. 25-26) In step one, the ALJ found that Lugo-Gonzalez did not engage in substantial gainful activity since March 15, 2005, his alleged onset date. (Tr. 26) At step two, the ALJ found that Lugo-Gonzalez had severe impairments of depression, multi-level degenerative disc disease with low back pain, uncontrolled hypertension, knee pain, and diabetes mellitus. (Tr. 26) At step three, the ALJ found that Lugo-Gonzalez's impairment did not meet or medically equal one of the listed impairments. (Tr. 28) The ALJ relied on the state agency medical consultants' evaluations and the expert testimony of Dr. Jilhewar and Dr. Kravitz in her determination. (Tr. 28) The ALJ also relied on Lugo-Gonzalez's medical records and used a special procedure to evaluate his mental impairment. (Tr. 28) She concluded that Lugo-Gonzalez has depression that would be most appropriately evaluated under section Listing 12.04. (Tr. 28) She further found that his depression resulted in a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, concentration, persistence, or pace,

and no episode of decompensation.  (Tr. 28)  His depression did not satisfy Listing 12.04.  (Tr. 28)

In determining Lugo-Gonzalez's RFC, the ALJ found that he had the Residual Functional Capacity (RFC) to

> perform lifting and/or carrying 10 pounds frequently and 20 pounds occasionally, unlimited sitting, standing and/or walking 6 hours in an 8-hour workday, no climbing ladders, ropes, or scaffolds, and occasional climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling.  He must sit for 5 minutes every 3 hours or alternate sit/stand. He has the mental residual functional capacity for no strict production deadlines and no regular dealing with irate members of the public.  He is limited to understanding, remembering, and carrying out unskilled, simple, repetitive tasks. He has the ability to respond appropriately to only infrequent changes in the work setting. He is unable to speak in English.

(Tr. 28)

In reaching this RFC determination, the ALJ discussed Lugo-Gonzalez's daily activities and his medical history.  (Tr. 29-30) With respect to Lugo-Gonzalez's back condition, the January 2006 consultative examination findings revealed full knee ranges of motion despite pain, and slightly reduced lumbar spine ranges of motion, but otherwise normal lumbar, thoracic, and cervical spine

findings.  (Tr. 29)  Although Dr. Llobet[7] identified Lugo-Gonza-
lez's hypertension as malignant and not well controlled, he
underwent a normal stress test in May 2006.  (Tr. 29)  Further-
more, physical examinations in March 2007 and May 2007 were
normal.  (Tr. 29)  Radiographical evidence showed a narrowing at
L4-5 disc space and mild arthritic changes in the right knee.
(Tr. 29)  The ALJ found that Lugo-Gonzalez's medically determina-
ble impairments reasonably could be expected to produce the
alleged symptoms, but she noted that his testimony concerning the
intensity, duration, and limiting effects of his symptoms was not
entirely credible.  (Tr. 29)

The ALJ stated that Lugo-Gonzalez exaggerated his com-
plaints.  (Tr. 29)  He had no physical treatment after July 2004
for a "very long time", and when he resumed treatment, the
physical findings were "very minor."  She noted that he testified
to six herniated discs, which was not corroborated by the record,
he claimed that he had a severe chronic cough, but did not cough
once during the hearing, and his doctor thought he had white coat
syndrome.  (Tr. 29) Furthermore, his activities of daily living
were inconsistent with either physical or psychiatric impairments
more limiting than the ALJ determined.  For example, he lived

---

[7] The ALJ's decision identified Dr. Lorbet, but there is no person
identified by that name in the record.  The court assumes the ALJ meant Dr.
Llobet.

alone and was independent in activities of daily living, he drove, exercised, walked to the store and carried ten to 20 pounds home, and spent time with friends. (Tr. 29) The ALJ also noted that Lugo-Gonzalez had been treated conservatively despite refusing surgery and additional epidural steroid injections that had some positive effect in the past. (Tr. 29)

With respect to Lugo-Gonzalez's mental condition, his depression was controlled on medications and had improved. (Tr. 30) He was not suicidal and had no past history of psychiatric treatment. The ALJ accorded no weight to the treating source's GAF scores of 40-45 because there were frequent reports of less depressed mood and intact mental status. (Tr. 30) She gave greatest weight to Dr. Kravitz's May 13, 2008 testimony because he fully explained the basis for his conclusions and the ALJ found them to be well-supported. Even though Dr. Kravitz said depression was not a severe impairment, the ALJ found some non-exertional limitations and found it to be a severe impairment. (Tr. 30)

The ALJ gave greatest weight to Dr. Jilhewar's testimony in April 19, 2007, and stated that the subsequent treating records did not support additional limitations. The ALJ found the medical expert's testimony more convincing than the findings of the state agency doctors. (Tr. 30) Finally, the ALJ rejected the

physical residual functional capacities of Lugo-Gonzalez's
treating doctors because although Dr. Llobet concluded that he
could not work, that conclusion was inconsistent with objective
findings throughout his treatment notes and the objective find-
ings of the consultative examination.  (Tr. 30)  Also, no ortho-
pedist identified physical limitations from lower back pain, and
no other doctors had specifically identified physical limitations
from other impairments.  (Tr. 30)

With the RFC determined, at step four the ALJ found that
Lugo-Gonzalez had no relevant past work.  (Tr. 30)  At step five,
the ALJ found that considering Lugo-Gonzalez's age, education,
work experience, and RFC, there were a significant number of
light occupation and sedentary jobs available in the national
economy that he could perform.  (Tr. 31)  The ALJ asked the
vocational expert whether jobs existed in the national economy
given Lugo-Gonzalez's age, education, work experience, and
residual functional capacity.  VE Pagella[8] testified that Lugo-
Gonzalez would be able to perform the requirements of light
occupations but the need to sit five minutes every hour reduced
the number of light occupation jobs available by half.  (Tr. 31)
The remaining light occupation jobs included cleaning jobs
(9,000), parking lot attendant (2,000), and production-visual

---

[8] The ALJ attributed the testimony to VE Pagella, but VE Knuston gave
the testimony that the ALJ referred to in her opinion.

inspectors, checkers, and weighers (3,500). (Tr. 31) Pagella also testified that available sedentary jobs were reduced by 30 percent due to Lugo-Gonzalez's need to alternate sit/stand. The remaining sedentary jobs available that he could perform included bench assemblers (4,800), packers/packagers (2,500), and inspectors, weighers, and checkers (960). (Tr. 31) The ALJ concluded Lugo-Gonzalez had not been under a disability as defined in the Social Security Act from March 15, 2005, through the date of her decision. (Tr. 32)

Lugo-Gonzalez raises six issues in his request for reversal of the ALJ's decision: 1) the ALJ failed to consider two of his impairments, obesity and spinal stenosis, in determining whether the impairments met or equaled a Listing; 2) the ALJ failed to analyze evidence of his physical impairments, either individually or in combination, and to obtain medical expert testimony on the issue of medical equivalence regarding his physical impairments; 3) The ALJ's RFC conclusions were not supported by evidence; 4) The ALJ made an erroneous determination that Lugo-Gonzalez was not credible; 5) the ALJ's hypotheticals to the vocational experts were incomplete resulting in erroneous Step Five determination; and 6) the ALJ erred in not resolving the discrepancy between the VE's testimony and the DOT description of the exertional demands of hand packager and production weigher.

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); Schmidt v. Barnhart, 395 F.3d 737, 744 (7th Cir. 2005); Lopez ex rel Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). See also Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. Rice v. Barnhart, 384 F.3d 363, 368-69 (7th Cir. 2004); Scott v. Barnhart, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." Lopez, 336 F.3d at 539.

Supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §416.920. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §416.920(b). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining

capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R. §416.920(e). However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. §423(d)(2); 20 C.F.R. §416.920(f).

In his first argument, Lugo-Gonzalez claims that the ALJ only considered his mental impairments and erred by failing to consult with the medical expert to determine whether his physical impairments met or equaled a listing, either individually or in combination. More specifically, Lugo-Gonzalez asks the court to consider whether the ALJ considered his obesity and spinal stenosis in determining whether his medical condition met or medically equaled a Listing. Lugo-Gonzalez argues that his medical condition meets or equals Listing 1.04.

The listing describes those impairments that are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his age, education, or work experience."

20 C.F.R. §404.1525(a); Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004)(describing the listed impairments as presumptively disabling).  A claimant also may demonstrate that his impairment(s) is equivalent to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §404.1526(a).  For a claimant to show that he meets a listed impairment, he must show his impairment meets each required criterion, and he bears the burden of proof in showing his condition qualifies.  Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999).  The Supreme Court has emphasized that, "for a claimant to show that his impairment matches a listing it must meet all of the specified medical criteria."  Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (emphasis in original).  See also Sims, 309 F.3d at 428 (relying on same).  A claimant must meet the criteria in the capsule definition, as well as the criteria in the subsidiary paragraphs.  Blakes ex rel. Wolfe v. Barnhart, 331 F.3d 565, 570 (7th Cir. 2003); Scott, 297 F.3d at 595 n.6.  An impairment that manifests only some of the specified criteria, no matter how severely, does not qualify. Zebley, 493 U.S. at 530, 110 S.Ct. at 891.

    If an impairment does not match a listed impairment, the ALJ then must consider whether the impairment is medically

equivalent to a listed impairment.  20 C.F.R. §404.1529(d)(3).

Where a claimant has a "combination of impairments, no one of

which meets a listing, we will compare your findings with those

for closely analogous listed impairments.  If the findings

related to your impairments are at least of equal medical signif-

icance to those of a listed impairment, we will find that your

combination of impairments is medically equivalent to that

listing."  20 C.F.R. §404.1526(b)(3).

Although the claimant bears the burden of establishing that

he meets or equals a Listing, when an ALJ has failed to cite any

listed impairment and has provided only a perfunctory analysis,

there is little basis for meaningful judicial review and remand

may be required.  Brindisi v. Barnhart, 315 F.3d 783, 785-86 (7th

Cir. 2003).  See also Barnett, 381 F.3d at 668 (stating that an

ALJ must discuss the listing by name and give more than a per-

functory analysis of that listing).  The ALJ is required to build

an "accurate and logical bridge from the evidence to the conclu-

sion" so that a reviewing court can perform meaningful judicial

review.  Scott, 297 F.3d at 595.

The ALJ's finding that Lugo-Gonzalez did not have an impair-

ment or combination of impairments that met or medically equaled

one of the listed impairments was brief with respect to Lugo-

Gonzalez's physical impairments, and predominately focused on

Listing 12.04 for evaluating his mental impairments.  The ALJ did not discuss, reference, or cite Listing 1.04, which addresses disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root or the spinal cord.  20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.04.  In fact, the only reference the ALJ made to Lugo-Gonzalez's physical impairments was that "the claimant's impairments do not meet or equal any listing based on a comparison of the listings by the State agency, medical expert Dr. Ashok Jilhewar (for physical impairments), medical expert Kravitz (for mental impairments) and the undersigned Administrative Law Judge."  (Tr. 28)  The Commissioner responds that the ALJ's determination that Lugo-Gonzalez's physical impairments did not meet or equal a listing is supported by the fact that Dr. Montoya and Dr. Ruiz, the state agency reviewing physicians, signed the Disability Determination and Transmittal Forms, indicating that Lugo-Gonzalez did not meet a Listing.

The Disability Determination and Transmittal forms completed by the physicians designated by the Commissioner may be conclusive proof that the claimant does not meet a Listing.  See Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004) (quoting Farrell v. Sullivan, 878 F.2d 985, 990 (7th Cir. 1989)); Scott v. Sulli-

van, 898 F.2d 519, 524 (7th Cir. 1990)(explaining that a state
agency physician was designated by the Secretary to determine
medical equivalence).  The ALJ may rely solely upon the opinion
of the medical experts given in the DDT forms and give little
additional explanation as long as there is no contradictory
evidence in the record.  Ribaudo v. Barnhart, 458 F.3d 580, 584
(7th Cir. 2006).  However, reliance on the DDT forms is not
justified where there is contradictory evidence of record.
Ribaudo, 458 F.3d at 584.  When contradictory evidence is pres-
ent, the ALJ must minimally articulate her reasons for holding
contrary to this evidence. Ribaudo, 458 F.3d at 584.

Lugo-Gonzalez pointed to physical impairments that contra-
dict the ALJ's finding and may meet the requirements of Listing
1.04.  For example, the ALJ found that Lugo-Gonzalez's severe
physical impairments included multi-level degenerative disc
disease with low back pain.  Within her finding of this severe
impairment she considered a July 2004 MRI showing spinal steno-
sis.  On March 19, 2007, Lugo-Gonzalez sought treatment for lower
back pain which he described as a tightening pain with numbness
and tingling.  Also on April 16, 2007, Dr. Spott found that Lugo-
Gonzalez had lumbar disc bulging and lumbar radiculopathy.  How-
ever, the ALJ did not discuss any of this evidence in determining
that Lugo-Gonzalez did not meet or equal a Listing.  Because the

ALJ failed even to mention Listing 1.04 and minimally articulate how the contrary evidence failed to satisfy Listing 1.04, the ALJ did not adequately develop the record, and the decision must be remanded on this issue. On remand, the ALJ must provide a more in-depth discussion of whether Lugo-Gonzalez's spine impairment met Listing 1.04. In undertaking a new step three determination regarding Listing 1.04, the ALJ must consider all of the important evidence and explain why the evidence is discounted.

Lugo-Gonzalez next disputes the ALJ's finding that his testimony was not entirely credible and argues that based upon that belief, the ALJ gave inappropriate weight to his testimony concerning the limitations and severity of his symptoms. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. Schmidt v. Astrue, 496 F.3d 833, 843 (7th Cir. 2007); Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles her opinion to great deference. Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997); Allord v. Barnhart, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that

affords meaningful review," the ALJ's credibility determination is not entitled to deference.  Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002).  Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. §404.1529(a); Arnold v. Barnhart, 473 F.3d 816, 823 (7th Cir.2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); Scheck, 357 F.3d at 703.  If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]."  20 C.F.R. §404.1529(c); Schmidt, 395 F.3d at 746-47

("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1, 1996 SSR LEXIS 4 at *2. See also Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004); Carradine v. Barnhart, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits"). Rather, when evaluating subjective complaints of pain, the Seventh Circuit instructs:

> If the allegation of pain is not supported by objective medical evidence in the file and the [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and

intensity of the claimant's pain, precipita-
tion and aggravating factors, dosage and
effectiveness of any pain medications, other
treatment for relief of pain, functional
restrictions, and the claimant's daily activ-
ities. (internal citations omitted)

Luna v. Shalala, 22 F.3d 687, 691 (7th Cir.
1994)

See also Zurawski v. Halter, 245 F.3d 881, 887-88 (7th Cir. 2001)

(quoting same).

    In addition, when the ALJ discounts the claimant's descrip-

tion of pain because it is inconsistent with the objective

medical evidence, she must make more than "a single, conclusory

statement . . . . The determination or decision must contain

specific reasons for the finding on credibility, supported by the

evidence in the case record, and must be sufficiently specific to

make clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individual's statements and

the reasons for that weight."  SSR 96-7p, at *2, 1996 SSR LEXIS 4

at *3-4.  See Zurawski, 245 F.3d at 887; Diaz v. Chater, 55 F.3d

300, 307-08 (7th Cir. 1995)(finding that the ALJ must articulate,

at some minimum level, his analysis of the evidence).  She must

"build an accurate and logical bridge from the evidence to [her]

conclusion."  Zurawski, 245 F.3d at 887 (quoting Clifford, 227

F.3d at 872).  "Both the evidence favoring the claimant as well

as the evidence favoring the claim's rejection must be examined,

since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight."  Bauzo v. Bowen, 803 F.2d 917, 923 (7th Cir. 1986)(emphasis in original).

In the instant case, the ALJ began by stating that she found that Lugo-Gonzalez's symptoms reasonably could be expected to result from his medically determinable impairment, but the ALJ found Lugo-Gonzalez's statements concerning the intensity, duration, and limiting effects of the symptoms not entirely credible. Lugo-Gonzalez asserts that the ALJ erred in drawing a negative inference about his credibility from her finding that after July 2004, Lugo-Gonzalez did not receive physical treatment for a "very long time."  Lugo-Gonzalez's primary claim was that he was limited because of pain.  The ALJ found that Lugo-Gonzalez's treatment — pain patches, pain medications, and epidural steroid injections — was conservative despite his refusal to have surgery or additional epidural steroid injections which had some positive effect on the pain.

In assessing credibility, infrequent treatment can support an adverse credibility finding where the claimant does not have a good reason for the infrequency of treatment.  SSR 96-7p, 1996 SSR LEXIS 4 at *21-22.  However, before the ALJ may draw inferences about the claimant's condition from infrequent treatment,

an ALJ first must discern from the claimant the reasons for infrequent treatment.  Craft, 539 F.3d at 679 (inability to pay for treatment, for example, may be an acceptable reason for non-compliance).

Here, the ALJ did not specifically question Lugo-Gonzalez about his lack of treatment, although she did question him regarding the pain treatments he received, when he received them, and what he was doing in between treatments.  She also questioned him about the effects of his treatments, including the pain patches and pain pills.  Furthermore, the ALJ's opinion provided a detailed medical history and stated that Lugo-Gonzalez was treated by Dr. Martin, a chiropractor, from September 2005 through June 2007 for back pain, noting that he failed to seek any treatment from Dr. Martin in 2006.  The ALJ also acknowledged that Lugo-Gonzalez received medical treatment during 2006 but that it was not for back pain.  The ALJ found that when treatment resumed, the physical findings on repeated examinations were "very minor."  She also noted that Lugo-Gonzalez's physical examinations in 2007 were normal, despite having a large disc herniation at L5-S1 and L4-5.

Because Lugo-Gonzalez continued to receive treatment, albeit not for the symptoms he now claims are the cause of his inability to work, the ALJ was permitted to draw a negative inference.  If

the symptoms caused the level of pain that Lugo-Gonzalez testi-
fied to experiencing, it was reasonable to expect that he would
have sought treatment and complained of the pain to the doctors
he consulted in 2006.  The ALJ did not draw her inference from
the void of medical treatment, rather she concluded that Lugo-
Gonzalez's failure to seek treatment for his back, despite
continuing medical treatment for other impairments, provided
insight into the persistence and severity of the pain he experi-
enced.  Furthermore, the mild findings in his subsequent medical
visits corroborated the ALJ's finding.

In addition to the in-depth explanation of Lugo-Gonzalez's
medical history, the ALJ considered the statements Lugo-Gonzalez
made that were not supported by the evidence of record, his con-
duct during the hearing, and his daily activities in assessing
his credibility.  Although the ALJ erred in stating that one of
Lugo-Gonzalez's doctor thought he had white coat syndrome, when
the record stated that his physician ruled out white coat syn-
drome, the ALJ pointed to sufficient evidence that correctly
supported her decision to discredit Lugo-Gonzalez's explanation
of the pain he suffered.  The ALJ explained that Lugo-Gonzalez
testified to having six herniated discs when the medical evidence
showed he only had three.  His activities of daily living  also
were inconsistent with his complaints of pain.  Lugo-Gonzalez

lived independently, cooked, cleaned, drove, walked to the store, and carried ten to 20 pounds of food home. He exercised and spent time with his friends. Lugo-Gonzalez also received epidural injections in the past that reduced his pain, and no orthopedist had identified physical limitations from lower back pain or from any other impairment.

The court cannot find that the ALJ's credibility determination was patently wrong because it was based on the record as a whole and contained an adequate explanation of Lugo-Gonzalez's medical history, daily activities, and medication. Although the ALJ may have erred in noting that Lugo-Gonzalez had white coat syndrome and that he did not cough during the hearing, although he reported only coughing after taking his medication, these misstatements did not alter the ultimate outcome. The ALJ adequately supported her credibility determination with a discussion of Lugo-Gonzalez's treatment history, lack of abnormal test results, refusal to seek further treatment including surgery and additional injections, and his personal testimony regarding his daily activities. Since the court will not overturn an ALJ's credibility determination unless it is "patently wrong" and not supported by the record, the ALJ's determination stands. See Schmidt, 496 F.3d at 843 ("[W]e will reverse an ALJ's credibility determination only if the claimant can show it was patently

wrong.").

    Lugo-Gonzalez next disputes the ALJ's RFC determination.
Specifically, he argues that the ALJ failed to consider his
obesity in determining his RFC determination and that the ALJ's
RFC determination that Lugo-Gonzalez must be able to sit for five
minutes every three hours is not supported by the evidence.  If a
claimant is obese, the ALJ must address the "incremental effect"
of obesity on the claimant's limitations.  Gentle v. Barnhart,
430 F.3d 865, 868 (7th Cir. 2005).  Even if a claimant does not
contend that obesity is one of his impairments, SSR 02-1p re-
quires an ALJ to consider the effects of obesity on the claim-
ant's other conditions.  However, failure to explicitly consider
these effects can be "harmless error."  Prochaska, 454 F.3d at
736.  Since the ALJ in Prochaska "sufficiently analyzed" the
claimant's obesity (by implicitly considering the issue, in part
by relying on medical documents that noted the claimant's height
and weight), and because the claimant did not specify how obesity
specifically impaired her work ability, the Seventh Circuit found
that any error on the ALJ's part in not explicitly considering
the claimant's obesity was harmless.  Prochaska, 454 F.3d at 737.
See Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004)(ALJ's
adoption of limitations suggested by doctors who were aware of
claimant's obesity, plus claimant's failure in specifying how

weight impaired the ability to work, was harmless error).

Lugo-Gonzalez's height is 5' 7" and his weight ranged from 258-306 pounds. At the time of the April 2006 hearing, his body mass index was 42. In rendering her decision, the ALJ considered Lugo-Gonzalez's medical records as a whole, which made repeated references to his obesity. For example, the ALJ considered Dr. Perez's consultative examination which diagnosed Lugo-Gonzalez with morbid obesity. Dr. Llobet wrote a letter explaining that Lugo-Gonzalez was obese, and he also made note of his obesity in the medical chart from Lugo-Gonzalez's 2006 visit. Dr. Jilhewar reviewed all of the medical records, including those prepared by Dr. Perez and Dr. Llobet, that made frequent references to obesity. The ALJ relied on the limitations suggested by these doctors, primarily Dr. Jilhewar, who considered the claimant's obesity, as she was so permitted. Skarbek, 390 F.3d at 504. Furthermore, Lugo-Gonzalez did not make any attempt to explain how his obesity exacerbated his underlying conditions or impaired his ability to work. Therefore, the ALJ did not commit reversible error by omitting a discussion of Lugo-Gonzalez's obesity in her decision because it was factored into her decision indirectly.

Lugo-Gonzalez also argues that the ALJ erred in finding that he must sit for five minutes every three hours because this

determination was inconsistent with both Lugo-Gonzalez's testimony that he could stand for 20 to 25 minutes before needing to sit and the limitations given by Dr. Jilhewar. Dr. Jilhewar stated that Lugo-Gonzalez was able to stand up to six hours in an eight-hour day but that he would have to sit for five minutes at 30 minute intervals. The ALJ explained that she gave the greatest weight to Dr. Jilhewar's testimony. However, she seemed to disregard both Dr. Jilhewar's and Lugo-Gonzalez's testimony limiting Lugo-Gonzalez's ability to stand more than 30 minutes without the need to sit. The ALJ failed to explain how she reached this RFC determination, and none of the remaining medical evidence supported this finding. The RFC must be assessed based on all relevant evidence in the record, and given the lack of any supporting medical evidence, the court finds that the ALJ's determination that Lugo-Gonzalez must sit for five minutes every three hours failed to meet this standard.

Although the ALJ's RFC determination that Lugo-Gonzalez must sit for five minutes every three hours was inconsistent with the limitations provided by Dr. Jilhewar and those Lugo-Gonzalez testified to, the ALJ alternatively provided that Lugo-Gonzalez had the residual functional capacity to perform a job that gave him the option to sit and stand at will. This conclusion was adequately supported by the evidence of record, including the

testimonies of Dr. Jilhewar and Lugo-Gonzalez, and is not in dispute. At the hearing, the ALJ questioned the VE regarding the availability of positions for a person that needed the ability to sit and stand at will, to which the VE responded that a signifi-cant number of positions were available, although reduced 30 percent from those available to someone who was required to sit for five minutes of every hour. Although the ALJ erred in finding that Lugo-Gonzalez had to sit for five minutes every three hours, which was not supported by the record, there were significant jobs Lugo-Gonzalez could perform with the adequately supported alternative RFC to sit and stand at will. Therefore, the outcome of Lugo-Gonzalez's claim would not be altered by remanding the case to resolve the discrepancy over the frequency in which Lugo-Gonzalez must sit. Because the doctrine of harm-less error prevents the remand of claims that would not affect the outcome of the case, the decision of the Commissioner is AFFIRMED as it relates to this issue. Prochaska, 454 F.3d at (7th Cir. 2006)(applying the harmless error doctrine to deny remand because requiring the ALJ to consider claimant's obesity would not affect the outcome of the case).

Lugo-Gonzalez next argues that the ALJ erred in failing to incorporate all of the RFC limitations and those limitations that were supported by medical evidence in the hypotheticals she posed

to the VEs.  The Commissioner has the burden at step five to establish that given Lugo-Gonzalez's condition, he could perform substantial gainful work existing in the national economy.  See Kasarsky v. Barnhart, 335 F.3d 539, 543 (7th Cir. 2003).  During both hearings, the ALJ consulted a VE to help assess whether there would be jobs that Lugo-Gonzalez could perform in spite of his limitations.  Lugo-Gonzalez contends that the ALJ did not incorporate his need to sit every 30 minutes, his inability to speak English, his physical ability only occasionally to balance, crouch, crawl, kneel, stoop, or climb ramps or stairs, his inability to climb ladders, ropes, or scaffolds, his mental ability only to understand, remember, and carry out repetitive, simple unskilled tasks, his age, and work experience.  He also contends that the questions posed to VE Knutson at the first hearing only included physical limitations and did not consider limitations on his mental ability.

With regard to Lugo-Gonzalez's inability to speak English, Lugo-Gonzalez testified through an interpreter at both hearings, and it is clear from Knutson's testimony that he understood that the ALJ's hypothetical included an inability to speak English. At the first hearing, the ALJ asked Knutson to add the "ability to speak English" and how that affected the occupational base. She further questioned Knutson whether there were sedentary jobs

available that accommodate Lugo-Gonzalez's lack of English. At the second hearing, the ALJ proposed a hypothetical to VE Pagella that included a person that spoke limited English. Upon cross-examination of Pagella by Lugo-Gonzalez's attorney, he included the limitation that the person was not conversant in English. The ALJ proceeded to remind counsel that she already included that limitation in her hypothetical and asked Pagella if he included it in his prior testimony. Pagella acknowledged that he did include that limitation. Therefore, the ALJ included Lugo-Gonzalez's inability to speak English in her hypotheticals to the VEs, and the VEs were aware of Lugo-Gonzalez's inability to speak English because he testified through an interpreter.

However, the ALJ did err in failing to question the VE about the availability of jobs for someone who needed to sit for five minutes every 30 minutes. Dr. Jilhewar and Lugo-Gonzalez testified that Lugo-Gonzalez needed to sit approximately five minutes every 30 minutes, but when the ALJ questioned the VEs, she proposed a hypothetical individual who had to sit once each hour, not each half hour. Although the ALJ found that Lugo-Gonzalez had the RFC to sit once every three hours, the court already has determined that this was not supported by the record. The only evidence on point suggested that Lugo-Gonzalez needed to sit once every half hour. Because the ALJ erred in failing to incorporate

this limitation into the hypotheticals she posed to the VEs, the
vocational testimony may not have accurately revealed the number
of jobs in the national economy that a person like the claimant
could perform.  Stewart v. Astrue, 561 F.3d 679, 684 (7th Cir.
2009)(A hypothetical posed to a VE must include "all limitations
supported by medical evidence in the record.").  See also Young
v. Barnhart, 362 F.3d 995, 1005 (7th Cir. 2004) ("When the hypo-
thetical question is fundamentally flawed because it is limited
to the facts presented in the question and does not include all
of the limitations supported by medical evidence in the record,
the decision of the ALJ that a claimant can adjust to other work
in the economy cannot stand."); Kasarsky, 335 F.3d at 543 (ex-
plaining that the VE may not give accurate testimony if the
hypotheticals do not include all of the claimant's limitations).
While such an error normally would require remand, the ALJ
proposed an alternative RFC, finding that Lugo-Gonzalez could
perform a job that required him to sit and stand at will.
Because significant positions are available to someone with the
RFC to sit and stand at will, it again was harmless error that
the ALJ failed to incorporate the limitation of sitting five
minutes every half hour into the hypothetical questions she posed
to the VEs.  Lugo-Gonzalez retained the capacity to fulfill the
jobs that provide him with the option to sit and stand at will,

and therefore, the ALJ's error does not change the ultimate conclusion that someone with Lugo-Gonzalez's capacity could perform a significant number of jobs.

Lugo-Gonzalez also complains that the ALJ failed to include his mental limitations in the hypotheticals she proposed to the VEs, including his inability to understand, remember, and carry out repetitive, simple, unskilled tasks.  However, the ALJ did account for Lugo-Gonzalez's mental limitations when she asked the VE at the second hearing, Pagella, about the availability of jobs that did not require high production or include many frequent changes.  Although Pagella did not provide the number of jobs available, he did identify the same jobs Knutson determined were available at the first hearing, including light cleaning, parking lot attendant, hand packer, production visual inspector, a checker and a weigher, bench assembly, packer or packagers, and weighers.  Therefore, there were substantial positions available taking Lugo-Gonzalez's mental limitations into consideration.

With regard to the remaining physical limitations Lugo-Gonzalez argues the ALJ failed to take into consideration when she posed the hypotheticals to the VEs, it is apparent from the testimony that the limitations were taken into consideration. Generally, the hypotheticals must include all of the limitations supported by medical evidence.  Steele, 290 F.3d at 942.  How-

ever, an exception exists where the  vocational expert learned of the limitations independently, namely, through the testimony of the medical experts and claimant, and presumably accounted for them.  Steele, 290 F.3d at 942; Ragsdale v. Shalala, 53 F.3d 816, 819 (7th Cir. 1995).  Here, the first VE, Knutson, was present for Dr. Jilhewar and Lugo-Gonzalez's testimonies.  Similarly, the second VE, Pagella, was privy to a summary of Dr. Jilhewar's testimony and heard testimony of Lugo-Gonzalez's daily activities.  Because the ALJ adopted Dr. Jilhewar's RFC finding almost in its entirety, and the VEs were aware of the limitations he proposed from their presence at the hearings where the testimony was given or summarized, the VEs presumptively accounted for these limitations.  Furthermore, Lugo-Gonzalez's attorney was provided the opportunity to cross examine the VE at both hearings.  Although he raised concerns about the availability of jobs when Lugo-Gonzalez's mental limitations were taken into consideration, he did not address any of the remaining limitations he asserts the ALJ failed to include in her hypotheticals.  Lugo-Gonzalez's "failure to protect his own interests below cannot constitute a sufficient ground for us to cast aside a prior opinion."  Ragsdale, 53 F.3d at 819.

As a final challenge to the VEs' testimony, Lugo-Gonzalez requests remand because the ALJ misstated that the number of

positions available in the economy for someone with Lugo-Gonza-lez's RFC was provided by the second VE, Pagella, when in fact the first VE, Knutson, provided the numbers. This scrivner's error is not a grounds for remand. Only one VE provided numbers to eliminate the risk of a dispute concerning the number of available positions. It was, therefore, clear that the ALJ misstated the name of the VE who gave these numbers. This does not have any effect on the ultimate outcome, as there remain the same number of jobs available regardless of which VE testified to the information.

Finally, Lugo-Gonzalez argues that there is a discrepancy between Pagella's testimony and the DOT description of the exer-tional demands of hand packager and production weigher that the ALJ failed to resolve. Pagella testified that the hand packager and production weigher jobs could be performed at light or seden-tary levels while Lugo-Gonzalez alleges that the DOT states both jobs are performed at medium exertion level. The Commissioner concedes that Mr. Pagella's testimony was inconsistent with the DOT and the jobs of hand packager and production weigher are described as medium work with "physical demand requirements in excess of those for light work." See DOT 920.587-018; 929.687-062.

At the hearing, the ALJ must ask the VE whether his responses are consistent with the DOT.  Overman v. Astrue, 546 F.3d 456, 464 (7th Cir. 2008).  SSR 00-4p also imposes an affirmative duty on the ALJ to elicit a reasonable explanation for any apparent conflicts between the VE's testimony and the DOT.  SSR 00-4p, 2000 SSR LEXIS 8; Overman, 546 F.3d at 463.  Although the claimant no longer forfeits his right to raise the discrepancy on appeal if he does not make light of it at the hearing, his failure to identify the conflict places on him the additional burden of showing that the conflict was so obvious that the ALJ should have resolved it without assistance.  Overman, 546 F.3d at 464.

Here, the ALJ asked Knutson and Pagella if their testimony was consistent with the DOT.  Knutson testified that he identified the number of available jobs by looking at the nine county Chicago Metropolitan statistical area and making adjustments based on the DOT for skill level and physical demand level. Pagella testified that his testimony was consistent with DOT and his assessment that jobs would exist in significant numbers was based on the United States Department of Labor, U.S. Census Bureau of Statistics and his professional experience.  Pagella agreed with jobs identified by Knutson and testified that production weigher and hand packer jobs could be performed at the light or sedentary levels.  Because both VEs agreed that the jobs were

consistent with the DOT, it was not obvious to the ALJ that a discrepancy existed. Lugo-Gonzalez's attorney did not identify the dispute at the hearing and now fails to show the court that the conflict was so obvious that the ALJ should have independently resolved it. However, if the positions were adjusted to take the discrepancy between the VEs' testimony and the DOT into account, eliminating the positions that require a medium exertional level, a significant number of jobs (4,800) remain. See Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993) (holding that 1,400 jobs is a "significant number"). Therefore, to the extent the ALJ erred in failing to resolve the conflict, the error was harmless and does not conflict with the ALJ's ultimate conclusion.

———————————

For the foregoing reasons, the decision of the Commissioner is AFFIRMED IN PART and REVERSED AND REMANDED pursuant to sentence four of 42 U.S.C. §405(g). On remand, the ALJ is directed to re-evaluate Lugo-Gonzalez's claim consistent with this opinion and provide sufficient evidence for her determination.

ENTERED this 11th day of March, 2011

s/ ANDREW P. RODOVICH
United States Magistrate Judge

53